## CLIFFORD J. HICKS and LILLARD HICKS v. N. K. SIMONSEN, Doing Business as SIMONSEN'S PIE BAKERY, Appellant.

Division Two, March 19, 1925.

1. **CONSTITUTIONAL STATUTE: Sections 4218 and 4219: Damages: Death of Injured Party.** Sections 4218 and 4219, Revised Statutes 1919, authorizing parents to recover damages for injuries resulting in the death of a minor child from the negligent operation of an automobile, do not deny to its owner the equal protection of the laws guaranteed by the Fourteenth Amendment. The right of personal action died with the child at common law, and the Legislature had the right to declare that the action survived to the child's parents.

2. ———: ———: **Automobiles: Classified as Common Carriers and Otherwise.** The Legislature, in the exercise of its police powers, in giving a right of action to parents for personal injury to their minor child resulting in its death, properly placed operators of automobiles engaged as common carriers for hire in the same category with other common carriers, and had the right to place other drivers of automobiles in a separate class and deal with them accordingly.

3. ———: **General: Counties of Sixty Thousand: Juror: Client of Party's Attorney.** The statute (Sec. 6639, R. S. 1919) declaring that "in every county of this State now containing, or which may contain hereafter, not less than sixty thousand nor more than two hundred thousand inhabitants, jurors shall be selected as hereinafter provided," is a general law, and not a special law. And being a reasonable classification, Section 6649, declaring that in any such county "any person may challenge any juror for cause" and "for any causes authorized by the laws of this State," and Section 6655, declaring that "if upon the *voir dire* it appears that any juror is in the employ of any person, firm or corporation who has within the six months last past employed, or who within such time has had in his or its employ, any attorney on either side of the case being

tried, the opposing party shall have the right to challenge such juror for cause," are likewise valid, and the court is authorized by them to exclude a juror who is in the employ of a client of defendant's attorney.

4. ————: Classification of Counties: Jurors: Attorney for Party: Legislative Discretion. The Legislature, in the exercise of its police power, can classify counties in such manner as it deems necessary to the orderly administration of justice and provide that in such counties only such jurors shall be selected as are entirely disinterested and free from the influence of attorneys on either side of the case.

5. Juries: Excusing Venireman: Fair Trial. Even if the statute which requires the court on the *voir dire* to exclude from the trial jury a juror who is employed by a client of appellant's attorney were held unconstitutional, and the juror was excluded on that sole ground, the question whether appellant received a fair and impartial trial still remains, and the judgment will not be reversed in the absence of any showing that he did not receive such a trial. If the twelve jurors were qualified in every respect to fairly and impartially try the case, the exclusion of a venireman in obedience to the invalid statute would not work a reversal. To work a reversal under the statute (Sec. 1276, R. S. 1919) there must have been error affecting appellant's substantial rights.

6. JUROR: Excusing: Inherent Right of Court. The court of its own motion may examine veniremen and excuse them, although not challenged by either party. And when a juror on the *voir dire*, whether challenged or not, is excused on the ground that he is an employee of a client of appellant's attorney, and no exception is saved, a reversal cannot be based on his exclusion.

7. NEGLIGENCE: Automobile: Skidding: Imprudent Driving: Dangerous Speed. Substantial evidence tending to prove that the driver of defendant's automobile, in broad day light, drove it at a fast rate of speed, down a heavy grade, over a hard-surfaced pavement, made slick by oil and rain, without attempting to stop, and while in plain view of a five-year-old girl, who had just left the sidewalk in an attempt to cross, at the usual place, the cross street, at its intersection with the street on which he was driving in the opposite direction, and who was throwing up her hands in distress and confusion, and ran against and injured her by negligently losing control of the car, is sufficient to support a verdict for damages against defendant, under the statute (Sec. 7585, R. S. 1919) declaring that every person operating a motor vehicle on a public highway "shall drive the same in a careful and prudent manner, and at a rate of speed so as not to endanger" the life or limb of any person.

Hicks v. Simonsen.

8. ————: **Evidence: Weight and Credibility: Demurrer.** It is the peculiar province of the jury to pass upon the weight of the evidence and the credibility of the witnesses, and it cannot be ruled that it was error to overrule defendant's demurrer to the evidence where the evidence of his negligence, if believed by them, was substantial.

9. ————: **Instruction: Measure of Damages: Inclusion of Wrongful Elements: Loss of Minor Child.** In an action for damages by the parents of a five-year-old daughter, who was injured by defendant's negligently driven automobile, and who, after being carefully treated by surgeons and after the broken bones of her leg had partially united, fell out of a chair, which fall broke her leg at the same place, at a time when her vitality was low, and produced acute dilation of the stomach, from which she died a day or two afterwards, an instruction telling the jury, if they find for plaintiffs, to assess their damages at such sum as will reasonably compensate them for the death of their daughter, in such an amount, not exceeding ten thousand dollars, as is fair and just, having regard for any mitigating and aggravating circumstances attending the acts producing the injury, and in arriving at their pecuniary loss, to take into consideration the money paid or agreed to be paid for medicines, medical and surgical attention, hospital bills, nurses, ambulances, funeral expenses, and other reasonable and necessary expenses incurred in caring for her during the sickness caused by said injury, to which should be added the value of whatever services she would reasonably have been expected to give to plaintiffs until she became twenty-one years of age, does not authorize a verdict, and is good as far as it goes, and if defendant had reason to believe it was misleading, or would warrant a recovery of damages to which plaintiffs were not entitled, it was his duty to point out his objection thereto, or to exclude its wrongful inclusion by an instruction of his own; and particularly will it not be held to be misleading, or to embrace unwarranted elements of damage, where defendant asked and was given an instruction telling the jury that plaintiffs could not recover for damages which their child may have sustained, or for any pain or suffering she may have endured in consequence of the injury, or for any mental suffering or grief or bereavement of plaintiffs, or for any loss of the comfort, society or love of said child, and where it is further evident, from the very modest sum allowed by the verdict, that the jury were not misled by the instructions.

Citations to Headnotes: 1 and 2, **Death**, 17 C. J. 41; 3 and 4, **Statutes**, 36 Cyc. 1012, 992; 5, **Appeal and Error**, 4 C. J. 3190; 6, **Juries**, 35 C. J. 340; 7 and 8, **Motor Vehicles**, 28 Cyc. 47, 49; 9, **Appeal and Error**, 3 C. J. 752.

Hicks v. Simonsen.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen*, Judge.

AFFIRMED.

*Culver, Phillips & Voorhees* for appellant.

(1)   The court erred in permitting the introduction of any evidence and in overruling the demurrer to the evidence, because Secs. 4218 and 4219, R. S. 1919, on which the action is based, are violative of Sec. 1, Art. 14, Amendments to the Constitution of the United States, in that they deny to appellant the equal protection of the law.   See cases collated 11 Mallory's U. S. Comp. Stat. Anno. p. 822; Setters v. Hays, 72 N. E. 119; Borguis v. Folk, 133 N. W. 209; Grier v. Railroad Co., 228 S. W. 454; Roberts v. Trunk, 179 Mo. App. 332.   (2) The court erred in sustaining the plaintiffs' challenge to the Juror Marlin otherwise qualified, solely on the ground that Sec. 665, R. S. 1919, authorizes the challenge of a juror if the juror's employer is or within six months has been the client of the attorney representing appellant, because said section is violative of Sec. 53, Art. 4, Mo. Constitution. Dunne v. Ry. Co., 131 Mo. 5.; Wooley v. Mears, 226 Mo. 50; State ex rel. v. Messerly, 198 Mo. 356; State ex rel. v. Miller, 100 Mo. 449; Setters v. Hays, 72 N. E. 119.   (3)   The court erred in overruling the demurrer to the evidence, because there is no substantial evidence to sustain the charge of negligence in the petition.   (4)   The court erred in giving plaintiffs' Instruction 7 on the measure of damages, because:   (a) The instruction did not limit the recovery to the value of the child's services during minority, and burial and other expenses incurred by her sickness and death, less the expenses of her support and maintenance during that time.   This is the correct measure of damages and the limit of liability.   Degan v. Jewell, 230 S. W. 66; Leahy v. Davis, 121 Mo. 233; Parsons v. Railroad, 94 Mo. 296.   (b)   The instruction told the jury to assess the damages at such sum as they might believe from the evidence "would reasonably compensate plaintiffs for

the death of their daughter, in such an amount as the jury might deem fair and just,'' and that in arriving at that amount, they might consider the value of the child's services during minority and the necessary expenses, instead of telling the jury that the pecuniary loss was limited to the value of such services and such expenses less the expense of her support and maintenance during minority. (c) The instruction authorized the jury to consider aggravating circumstances in arriving at the amount of their verdict, when there was no evidence of aggravating circumstances and when no facts were pleaded in the petition upon which to base exemplary damages, and when the amount of exemplary damages claimed was not separately stated in the petition. State ex rel. v. Ellison, 270 Mo. 567. (d) The instruction did not point out the facts or circumstances which if found would have the effect of aggravating the damages, but left the jury to grope in the dark and determine for themselves what fact or circumstances were sufficient to have the effect of aggravating the damages. Parsons v. Railroad, 94 Mo. 296.

*Randolph & Randolph* for respondent.

(1) Defendant charges that Sections 4218 and 4219 are unconstitutional, and this solely because he thinks there is a conflict between Sections 4217 and 4219, and that the conflict leaves Section 4217 unimpaired, but leaves the other sections which he selects for that purpose unconstitutional. Of course there is absolutely nothing in his point as made and preserved, and there would be nothing in it had he preserved it in some other form. (2) The question of the constitutionality of Sec. 6655, R. S. 1919, is not in this case at all, although the juror Marlin, who was one of the editors of a newspaper, a corporation, and client of appellant's attorneys, was excused from the jury on account of that section. The court continually exercises discretion in the discharge of jurors and the point is seldom preserved. There is no statutory prohibition against leaving a client, that is, a pri-

vate client, of any attorney in a case or his employee, on the jury, yet constantly in the interest of justice and in the interest of securing a fair and impartial jury, the court excuses clients of attorneys, the employees of clients of attorneys and the relatives of attorneys, and it is the proper exercise of discretion. Even had there been no statute it would have been a proper thing to have excused the Juror Marlin. It cannot be contended that Section 6655 is not one of the laws of the State. Section 6666 clearly gives the same right to challenge under the provisions of 6655 as it does to challenge for the grounds stated in Section 6632. This answers plaintiff's contention that Section 6655 is a local law. (3) Appellant's criticism of Instruction 7, that being the instruction as to the measure of damages, is wholly without merit and is not supported by any of the decisions. The instructions simply followed the language of the statute authorizing the action. Dalton v. Refining Co., 188 Mo. App. 529; Sharp v. National Biscuit Co., 179 Mo. 553; Dugdale v. Ry., Light, Heat and Power Co., 195 Mo. App. 256; Sec. 7585, R. S. 1919; Sec. 7593, R. S. 1919; Roberts v. Trunk, 179 Mo. App. 362; State ex rel. Dunham v. Ellison, 278 Mo. 649. (a) The verdict in this case is not a large verdict when everything is considered. The verdict for loss of service is about thirty-four hundred dollars. The remainder of the verdict is for expenses, money actually paid out. (b) The only instruction on the measure of damages asked by appellant is his Instruction 4, which omits the point that he contends should have been embodied in respondents' Instruction 7. Appellant did not ask any instruction containing the limitation "less the expense of her support and maintenance during minority," and, of course, it is very apparent why he did not do so, as there is absolutely no evidence whatever in this case as to any expenditure of costs of care and maintenance, nor as to probable cost of care and maintenance in the future. That element for that reason was not in the case and was waived by ap-

pellant.  Baldwin v. Harvey & Dunham, 191 Mo. App.
233; Drakes v. City of Bosworth, 140 Mo. App. 37.

RAILEY, C.—On August 17, 1921, Clifford J. Hicks
and Lillard Hicks, his wife, filed in the Circuit Court of
Buchanan County, Missouri, an action for $10,000 dam-
ages against N. K. Simonsen, doing business as Simon-
sen's Pie Bakery, on account of the alleged injury and
death of plaintiffs' infant child, Betty Hicks.

On November 16, 1921, a first amended petition was
filed, on which the cause was tried.  It alleges in sub-
stance that the plaintiffs are the natural father and
mother of Betty Hicks, deceased, who was at the time of
her death, hereafter mentioned, a single and unmarried
infant five years of age; that defendant was engaged in
the bakery business in St. Joseph, Missouri, and as a
part of same owned and operated an automobile delivery
wagon in connection therewith; that St. Joseph is a mu-
nicipal corporation of Missouri, and a city of the first
class; that Seventeenth Street in said city runs north
and south and Francis Street runs east and west therein;
that both streets are public thoroughfares in said city
and intersect each other; that on April 15, 1921, Betty
Hicks, the infant child of plaintiffs, was lawfully on the
west side of Seventeenth Street, at its intersection with
Francis Street, and defendant, through its servant, Har-
old Everett Tarwater, while driving a delivery automo-
bile in a westerly direction upon Francis Street, and turn-
ing from there in a northerly direction upon Seventeenth
Street, upon the business of defendant, carelessly, negli-
gently and recklessly drove and operated said automo-
bile at a high and excessive rate of speed; that Francis
and Seventeenth streets are paved with smooth, hard-
faced paving, which at said time were wet and slippery
from rain; that said Tarwater, while thus operating said
automobile west along Francis Street, carelessly and
negligently failed to take into account the probability of
said automobile skidding on said streets; that Francis
Street, as it approaches the intersection of Seventeenth
Street from the east, is a down hill grade; that said Tar-

water continued to carelessly and negligently drive said automobile at said high and excessive rate of speed down said hill, carelessly and recklessly turned said automobile from its westerly course on Francis Street, to a northerly direction on Seventeenth Street and, in so turning, carelessly, negligently and recklessly caused said car to move to, upon and along the west or left-hand side of Seventeenth Street at the point where Seventeenth Street intersects the north side of Francis Street, at the place where pedestrians usually pass across Seventeenth Street, on the north side of Francis Street, and carelessly and negligently caused said automobile to skid toward the west at said point of intersection, so that said automobile struck, ran against, upon and over said Betty Hicks, who was then and there lawfully upon that portion of said intersection as aforesaid, west of the center of Seventeenth Street and near the west curb of the latter, and that said Tarwater so carelessly and negligently ran said automobile against, upon and over said Betty Hicks as aforesaid, when he saw, or in the exercise of ordinary care and prudence should have seen, said Betty Hicks, so as to have avoided striking her and causing her death, which occurred on June 8, 1921. It is charged that Tarwater was a careless, reckless and negligent automobile-driver, and that defendant was careless and negligent in employing him, and in retaining him in his employ, when he knew, or in the exercise of ordinary care ought to have known, that he was a careless, negligent and reckless driver. The petition then sets out the damages alleged to have been sustained, and the expenses paid out on account of the striking, injuring and killing of said Betty Hicks.

The answer is a general denial.

Mrs. A. Salmon testified that she lived at 218 North Seventeenth Street; that her home was not quite a half block from the corner of Seventeenth and Francis streets, and north from Francis Street; that she did not know Betty Hicks before the accident, but learned who she was afterwards. She was asked if she saw the accident,

and answered that she was standing at her bed-room window and could see plainly; that Betty Hicks was starting to cross Seventeenth Street, when the car came around the corner, and witness then turned her head, as she was afraid something might occur, and she could not get to the child in time; that she did not see what happened afterwards; that she first saw Betty Hicks at the northwest corner; that she had taken about two steps off of the sidewalk; that she had gone a trifle farther when the car came around the corner swiftly; that she was afraid something would happen and turned her head; that the child acted like she was puzzled, threw her arms in the air; that she then knew the child was rattled as to which way to go; that she stood still and threw her arms in the air; that she (the child) was then about three feet from the sidewalk; that she (witness) did not know what further occurred until she went out after the accident to inquire how badly the child was hurt; that the car was running fast and headed north; that it looked like a delivery covered car of some sort; that her son and daughter were in the room with her; that her daughter was thirteen years of age; that when she went out after the accident, it was a damp day, and she saw tracks, as though a car had skidded toward the sidewalk where the child was standing.

On cross-examination, witness testified in substance, that Francis Street runs east and west through St. Joseph, Missouri, and Seventeenth Street runs north and south through said city; that she lived at 218 on the west side of north Seventeenth Street, about one-half block north of Francis Street; that there is a brick residence on the northwest corner of Seventeenth and Francis Street; that north of this residence is a vacant lot, and next to it was the home of witness; that her house fronts on Seventeenth Street; that her bed-room was in the south part of her building; that it was a side room, but did not front on Seventeenth; that a living room was south of the bed-room where she was located; that she noticed the child standing there before she noticed the

automobile; that there was a grocery store on the corner, and at the next door was a meat market; that there was a basket store on the northeast corner of Seventeenth and Francis streets; that she learned the child lived on the corner of Seventeenth and Felix streets; that she lived on the west side of Seventeenth Street; that Betty Hicks was headed east toward the basket store and the automobile was coming from the east, around the corner by the basket store, when witness first saw it; that it had come along Francis Street from the east, and had just turned the corner going north at the basket store; that Betty Hicks, while in Seventeenth Street, took a few steps more, and witness saw the car getting closer to her, and then turned her head, and this was the last she saw of her; that when the child threw her arms in the air the automobile was pretty close to her, and that was when witness turned her head; that she was not watching the car, but watching the child mostly; that she took no particular notice of the car, and did not know where it stopped; that she did not see the car strike the child; that Francis Street is very steep down hill from Eighteenth to Seventeenth Street, and the latter is practically level along there; that it had rained the morning of the accident; that the pavement that morning was very slick; that it is a smooth pavement on Francis Street; that she did not think Francis Street was oiled before the accident; that she saw the automobile when it approached the child, and watched it until it went about twelve to fifteen feet when she turned her head.

Esther Salmon testified in behalf of plaintiffs substantially as follows: That she lived with her mother at 218 North Seventeenth; that she saw the accident; that she saw Betty Hicks crossing the street, and then the mother of witness screamed; that she was combing her hair by the window, when her mother pointed out to her Betty Hicks as a sweet child, and that she (witness) then saw her crossing Seventeenth Street; that the child was just a little ways from the curbing, when the car came around, and it had been raining; that the car skid-

ded and the mother of witness screamed; that she (witness) turned around, and when she went to school saw where the car had skidded; that the child was about three feet from the sidewalk; that she thought the car' was about two feet from the child, or something like that; that after the accident, she saw where the car had skidded, about five feet; that the car was going kind of fast, because the driver could not control his car, and could not stop in time.

On cross-examination, witness testified that when her mother screamed she looked out of the window, but did not see the car hit the child; that she saw the little girl crossing the street; that she was not across, and the car was coming around the corner; that her mother thought the car would hit her, screamed and ran; that she looked out of the window before her mother screamed; that when her mother pointed out the little girl, the latter was crossing the street, the car came around and her mother screamed and witness then turned toward her mother; that she never noticed the car when it turned the corner at the basket store; that the car was in about two feet of the child before she noticed it; that she then turned away and never saw the child after that; that about twenty minutes after the accident, she went on the street, where Seventeenth crosses Francis Street, and saw the tracks of the car where it had turned sharply toward the north into Seventeenth Street; that the car had come west on Francis Street by the basket store; that she thought the car was nearer the west than the east curb of Seventeenth Street when it swung around; that it was a sharp turn where the car swung from Francis into Seventeenth Street, as shown by the skidding; that the rear end of the car skidded down hill toward the west.

On re-direct examination, witness said this skidding was by the place where the child stood; that the child was at the place where they would cross to go up Francis Street toward the basket store.

Samuel A. Swafford, who lived at 302 South Nineteenth Street, and who was engaged in the shoe cobbling

business at 1703 Francis Street, testified, on behalf of plaintiffs, that he was engaged in business right next door to the basket store, east; that he was in his shop when Betty Hicks was injured. He described what occurred as follows:

"I was coming toward the door, coming out from my shop, when I saw this car go by, and then I got opposite the door. I didn't see the car, but I saw a little girl lying in the street and I started toward the little girl and someone—I think it was the driver of the car—go there and picked the little girl up before I did.

"Q. Now, what car was it you saw go by? A. It was the Simonsen pie wagon, it was.

"Q. And how was it traveling, whether fast or slow? A. It was traveling pretty fast.

"Q. And when you got out where was the car standing with reference to the little girl? A. The car was standing on the west side of Seventeenth Street facing north.

"Q. And how far from the little girl? A. Well, I should judge about forty or fifty feet or something like that.

"Q. How far was the little girl lying from the west curb of Seventeenth Street? A. I should judge about six or eight feet, something near there."

Witness further testified that he noticed the tracks of this car and they were close to the curbing, that is, about six or eight feet of the curbing west, and it had turned to go north on Seventeenth Street; that there were tracks where the little girl lay; that you could see the tracks where it had hit the little girl, and knocked her about three feet, as near as he could tell by looking at the ground where she had been dragged; that another car went by his place about thirty minutes before and turned completely around.

On cross-examination, witness said the car which turned around was a Ford touring car; that he saw no other car; that he was starting to the basket store; that he paid attention to this car because it was going pretty

fast, and this attracted his attention; that Francis Street is steep between Eighteenth to Seventeenth Street; that the street had been oiled, but he could not say when; that it had rained that morning and was damp, before the accident; that the street was very slick; that this car was going down this slippery hill so fast it attracted his attention; that it stopped on Seventeenth Street, north about forty or fifty feet from the corner; that he saw the marks made by this car skidding which turned north; that the first car which skidded backed up to Seventeenth Street and then went on the way it was going in the first place west on Francis Street; that at Francis Street, where it intersects Seventeenth Street, there is a great deal of travel by automobiles, vehicles, and pedestrians; that in his opinion, the first car turned around, because it was going too fast, and the street was slick; that when they started to skidding there is no way to prevent it.

On re-direct examination, he said skidding depended on the condition of the street and the speed; and also whether you are going straight, or make a sudden turn.

Charles L. Bowles testified for plaintiffs, in substance, that he was the manager of the basket store; that the first he saw of the accident was when the driver of the automobile was picking the little girl up out of the street; that it was the pie-bakery truck that struck her, which belonged to Simonsen; that the little girl was lying about middleways across the street as you come up from the east going west; that she was lying a little south of the intersection of where the sidewalk would cross; that the tracks of the automobile looked like they had begun sliding just in front of the store and slid on around until when the car stopped it was over on the west side facing north of Seventeenth Street.

On cross-examination, he stated that the little girl was picked up at the cross mark shown in the plat, which is a few feet south of the dotted line drawn from the northwest corner of Seventeenth Street and Francis Street to the basket store; that it was about halfway between the east and west lines of Seventeenth Street, and south of the north line of Francis Street.

Appellant, in his original brief, at page five, said:
"The only testimony as to the facts of the accident, introduced by the plaintiffs, was the evidence of Mrs. A. Salmon, her thirteen-year-old daughter, Esther Salman, Samuel A. Swafford, and Charles L. Bowles."

In view of the demurrer to the evidence interposed by appellant, at the close of the case, we have set out the testimony of the above witnesses as shown in the abstract of record very fully.

The evidence tends to show, on behalf of plaintiffs, that the little girl, Betty Hicks, was taken to her home from the place where she was injured; that Doctor Jacob Geiger, an eminent surgeon of fifty years' practice, was sent for, who had the child taken to Ensworth Hospital, in St. Joseph, on April 15, 1921, where he treated her until May 16, 1921, when she was taken home; that she had two nurses at the hospital, and was nursed by her mother when taken home; that her thigh was placed in a cast and after she was taken home she was moved around in a wheeled chair and taken outdoors where she could get fresh air; that she had not gained any in flesh when taken home, and looked thin and worn; that she was then weak and her vitality very low; that on May 29, 1921, Betty Hicks was sitting in the chair above mentioned out in the yard, while her mother went upstairs for a moment on an errand; that while the mother was absent the child fell forward and carried the chair with her, at least she was lying in the yard in such position as to indicate that she had fallen forward, as the chair was on top of her. After the bone was set originally the child progressed favorably and there was a union, but not a firm union when the second accident occurred. Dr. Geiger testified that it was a normal progress toward recovery, which was all he could expect in that length of time; that it ordinarily takes a child of her years ten to twelve weeks to produce good, strong, bony union; that at the time of the second injury the little girl had lost considerable flesh and strength, and was very

pale, due to the confinement and suffering; that as a result of 'the second injury, her leg was broken in the same place, and Dr. Geiger, with an assistant, performed another operation on May 29, 1921; that a piece of bone was taken from the tibia and was used as a plug to unite the two portions of the bone that had been broken; that the second operation was a great shock to the patient, and about eight or nine days thereafter she developed acute dilation of the stomach, a surgical complication that seldom appears; that she died of acute dilation of the stomach a day or two afterwards.   Dr. Geiger, in describing Betty Hicks' condition, said:

"The probability is that she would not have developed acute dilation of the stomach from the last shock alone had she not been reduced and her system out of equilibrium from the long confinement and previous injury." Dr. Geiger further testified: "Her vitality was reduced from the first injury, from which, in my opinion, she had not fully recovered. She was not at herself."

Dr. Geiger was asked: "Would the second injury have occurred at all from that fall if it had not been for the first injury? A. That fall on the soft lawn would not have broken her thigh if it had not been broken before."

Dr. Carl Potter testified, on behalf of plaintiffs, that he assisted Dr. Geiger in performing the second operation on Betty Hicks; that there was no union at the time he examined the child; that in his opinion, "The fracture that the child had originally was the primary cause of her death."

The evidence was undisputed that Betty Hicks was a bright, vivacious, lovable child and there was evidence as to the amount of the medical, surgical and other expenses incurred as a consequence of the injuries which she had received.

On behalf of the defendant, Harold Tarwater testified that he was on his delivery route. His last delivery before the accident was at Baldwin's grocery, a little after twelve o'clock, where Mr. Kellermier, a clerk at

Baldwin's, asked and received permission to ride towards his home for lunch. The next stop was to be at the Francis Street Grocery on the north side of Francis Street, midway between Sixteenth and Seventeenth Street. The witness drove from Twenty-sixth to Twenty-fifth Street, down Twenty-fifth to Francis, and west on Francis. When he got to the alley between Seventeenth and Eighteenth, it was his custom to and on the day of the accident he shut off the motor and applied his brake half way. About thirty feet in front of him, going in the same direction at about seven miles per hour, was a Ford sedan; the witness was going a little slower. When the Ford sedan got to Seventeenth Street, it turned completely around; it was going west and all at once it skidded west until the back end was headed north. The driver of the sedan had not more than stopped than he went on south. The witness turned his front wheels, slowed down more, and by the time the Ford sedan "got straightened out" and started south on Seventeenth Street, the witness's car was about twelve feet from the sedan. The car had been moving all the time. Just then the little girl ran out from behind the Ford sedan. When the witness first saw her, she was about ten feet ahead of the witness's car to the left, running north, looking over her shoulder back at the man in the sedan. The witness "hollered" at her and blew his horn. Apparently the little girl did not see the witness's car. The witness turned his wheels northward. He was then about "this side of that first line there" (at the X shown in the diagram fartherest east). The car was going about six miles an hour. The little girl kept coming straight towards the front of the witness's car. She was to the left of the left front wheel, and the witness thought that if he could turn the corner, he would miss her, and so he turned towards the north. When he turned, the back end of the automobile skidded westward down the hill and the little girl came in contact with the back wheel. The witness could not tell whether the wheel ran over her, as she had passed out of his sight. He jumped out, ran back and

picked her up. She was lying "just about where that chalk mark there is; that cross there, the lower one" (cross closest to the dotted line, about midway between the east and west sides of Seventeenth Street). The witness stated that he was intending to stop at the Francis Street Grocery; that he had no customer and no business on north Seventeenth Street, and no reason at all for him to turn north, except to avoid hitting the little girl; that when he first saw her, he did not have time to stop and avoid a collision.

The testimony of Lawrence Kellermier corroborates the evidence of the witness Tarwater.

Ten of the jurors before whom the case was tried returned a verdict in favor of plaintiffs for $5,000. A motion for a new trial was filed in due time, overruled and the cause appealed to the Kansas City Court of Appeals. The latter, on account of the constitutional questions involved, transferred the cause to this court.

The instructions and rulings of the court during the progress of the trial, as far as necessary, will be considered in the opinion.

I. Appellant's first assignment of error reads as follows: "The court erred in permitting the introduction of any evidence and in overruling the demurrer to the evidence, because Sections 4218 and 4219,

Constitutional Statutes.

Revised Statutes 1919 on which the action is based, are violative of Section 1 of Article XIV of the Amendments to the Constitution of the United States in that they deny to appellant the equal protection of the law. See cases collated in 11 Mallory's U. S. Comp. Stat. Anno., p. 822; Sellers v. Hayes, 72 N. E. (Ind.) 119; Borgnis v. Falk, 133 N. W. (Wis.) 209; Grier v. Railroad Co., 228 S. W. 454; Roberts v. Trunk, 179 Mo. App. 358."

We are saved the necessity of presenting an extended discussion of the above assignment, by reason of the opinion of JAMES T. BLAIR, J., in the case of Myers v. Kennedy, 306 Mo. 268, decided by Court in Banc, De-

cember 30, 1924, where he upheld the constitutionality of the law challenged in above assignment. In addition to what is said in the Myers-Kennedy case, we think the law complained of is valid and should be sustained for other reasons. The right of personal action died with the person at common law.

In the well-considered case of Clark v. Railroad, 219 Mo. l. c. 538, LAMM, J., in discussing this subject, said: "In our exposition of the statute it has been steadily held that, as there was no right of action for a wrongful death at common law at all, and, as the statute transmitting such right of action is in derogation of the common law, it must be construed with reasonable strictness. Furthermore, as the right of action is only of statutory origin, the Legislature had the right in creating it to prescribe a proclusive remedy, and nominate those entitled to sue and the terms on which they could sue, and has done so." To the same effect are the following cases: Coover v. Moore, 31 Mo. 574; McNamara v. Slavens, 76 Mo. l. c. 330-1.

In Barker v. Railroad, 91 Mo. l. c. 91, it is said: "Our statute, on this subject, both gives the right of action, and provides the remedy, for the death, where none existed at common law, and where an action is brought, under the statute, it can only be maintained subject to the limitation and conditions imposed thereby. In conferring the right of action, and in providing such remedy, in designating when, and by whom, suits may be brought, it was, as a matter of course, competent for the Legislature to provide and impose such conditions as it might deem proper, and the conditions thus imposed modify and qualify the right of recovery, or form, rather, we think, a part of the right itself, and upon which its exercise depends."

See also Oates v. Railroad, 104 Mo. l. c. 518; Packard v. Railroad, 181 Mo. l. c. 426-7; Gilkeson v. Railroad, 222 Mo. l. c. 185.; Chandler v. Railroad, 251 Mo. l. c. 600; Freie v. Frisco Ry. Co., 283 Mo. l. c. 463, 222 S. W. l. c. 825.

In the Freie case, at page 463, we said: "Under the common law adopted in this State in 1816, a personal right of action died with the person. In 1855, Lord Campbell's Act was adopted in this State, as shown by Section 2, Chapter 51, Revised Statutes 1855, page 647. This section has continued up to the present time, with the amendments thereto heretofore pointed out. It gives a right of action where none existed at common law. It points out the persons who may sue, and they alone must sue within the time prescribed by the statute. [Gibbs v. City of Hannibal, 82 Mo. l. c. 149; Barker v. Ry. Co., 91 Mo. 86; McIntosh v. Ry. Co., 103 Mo. 131; Packard v. Railroad, 181 Mo. l. c. 427; Bates v. Sylvester, 205 Mo. 493; Elliott v. Kansas City, 210 Mo. 576 et seq.; Clark v. Railroad, 219 Mo. l. c. 538; Gilkeson v. Railroad, 222 Mo. 173, and cases cited; Chandler v. Railroad, 251 Mo. l. c. 600.]"

According to our conception of the law, the Legislature was therefore clearly within its rights, when it passed the law complained of, supra.

(a)   Aside from the foregoing, we think the Legislature, in the exercise of its police power, in giving a right of action which did not exist at common law, properly placed operators of automobiles engaged as common carriers for hire in the same category with

**Common Carriers.** other common carriers. As to the liability of the other drivers of automobiles, the Legislature, in the exercise of its prerogative, in creating a liability which had no existence at common law, had the legal right to place them in a separate class and deal with them accordingly.

(b)   The legal right of the Legislature, as a police regulation, to classify automobiles as was done under the existing law, has, either in direct terms or on principle, been fully sustained in many adjudicated cases of this State, some of which are as follows: State ex rel. v. Vandiver, 222 Mo. 206, l. c. 240; White v. Railroad, 230 Mo. 287, l. c. 304-5; State v. Railroad, 242 Mo. 339; Heller v. Lutz, 254 Mo. 704.

The four cases above mentioned were determined by our Court in Banc, where the cases cited were exhaustively briefed on each side and fully considered by the court. In State ex rel. v. Vandiver, 222 Mo. 206, the court had before it for consideration the validity of an act of our Legislature passed in 1907, which provided that: "No life insurance company which pays as a salary . . . more than fifty thousand dollars per annum to any one person shall be licensed to transact business in this State." In sustaining this act, on page 240, the court said: "The reason for that is, as was before shown by all of the authorities that the State may by statute exclude any and all foreign corporations from doing business in the State, with or without giving any reason whatever therefor; and if the Legislature sees fit to give a reason for their exclusion, it may give a good or a bad excuse, wise or foolish one. That is a matter resting solely in the discretion of the Legislature, and over which the courts have no control."

In White v. Railroad, 230 Mo. l. c. 295-6, the court had before it an attack upon the constitutionality of Sections 3447 and 3448, Revised Statutes 1899 (now Secs. 1860 and 1861, R. S. 1919), which read as follows:

"Sec. 3447. That hereafter no garnishment shall be issued by any court in any cause where the sum demanded is two hundred dollars or less, and where the property sought to be reached is wages due the defendant by any railroad corporation, until after judgment shall have been recovered by the plaintiff against the defendant in the action.

"Sec. 3448. No railroad corporation shall be required to make answer to any interrogatories propounded to it, in any action against any person to whom it may be indebted on account of wages due for personal services, nor shall any default or other liabilities attach because of its failure to so answer in such cases, where a writ of garnishment was issued or served in advance of the recovery by the plaintiff against the defendant, in any action for two hundred dollars or less; and any judg-

ment rendered against any railroad corporation for its said failure or refusal to make answer to any garnishment so issued or served before the recovery of final judgment in the action between the plaintiff and defendant in the cases mentioned in Section 3447, shall be void, and any officer entering said judgment or who may execute the same shall be taken and considered a trespasser and in addition thereto may be enjoined by any court having jurisdiction."

VALLIANT, J., on page 297, in stating respondent's contention, said: "But the argument is, it is class legislation, it shuts the plaintiff off from pursuing his writ of garnishment against an employee of a railroad company when under like circumstances he could attach the wages of an employee of any other kind of corporation·or of an individual; it shuts him off from running the garnishment to recover his small debt, whereas a crèditor with a debt of over two hundred dollars could go in and recover; and it shuts him off from pursuing a railroad company, whereas, if it were any other kind of employer the process of garnishment could be used. That is the epitome of the argument."

Judge VALLIANT, in sustaining the constitutionality of above law, on pages 304-5, said: "The power of the General Assembly to enact class legislation has so often been considered by this court that we deem it necessary now to do no more than to refer to some of the cases. The well established doctrine of this court on that subject is that class legislation is not an offense against the Constitution of the State or of the United States if it is based on reason, and if it includes all persons or corporations coming within the reason. It is impossible to make all laws applicable to all persons or corporations; classes in fact exist, and the laws must be made to apply to them as classes. The General Assembly does not really create the class, although we usually speak of it in that way; the class exists by its very nature of inherent conditions, and the lawmaker recognizes the fact and makes the law to suit. If there is reason why a law

should be made to apply to a particular class the law-making department of the State government has authority to make it unless it is otherwise prohibited by the Constitution. [Humes v. Railroad, 82 Mo. 231; Daggs v. Ins., Co., 136 Mo. 382; Geist v. St. Louis, 156 Mo. 647; Hamman v. Coal Co., 156 Mo. 232; State ex rel. v. Henderson, 160 Mo. 216.] Those are a few of the decisions on this subject, but are not all that have been cited by the learned counsel for appellant, as reference to their briefs will show, but they are sufficient. Decisions of the Supreme Court of the United States are also cited to the same effect and answer respondent's contention in reference to the Federal Constitution.''

In State v. Missouri Pacific Railway Co., 242 Mo. 339, the court was called upon to determine the validity of the semi-monthly-payment law of 1911 (Laws 1911, p. 150). Section one of said act provides, that: ''All corporations doing business in this State, which shall employ any mechanics, laborers, or other servants, shall pay the wages of such employees as often as semi-monthly.'' On turning to pages 342 and following of the above report, it will appeal from the exhaustive briefs filed by counsel on both sides, that practically every leading case in the United States on the subject was called to the attention of the court, and extensive oral arguments were made at the hearing here. The validity of the law was upheld and, on page 373, the court went to the extent of holding that ''no valid contract can be made in this State which conflicts with its provisions.''

In Heller v. Lutz, 254 Mo. 704, the court had under review the validity of the Act of 1911 (Laws 1911, p. 143). Section one of said act reads as follows: ''All assignment(s) of wages, salaries or earnings must be in writing, with the correct date of the assignment and the amount assigned and the name or names of the party or parties owing the wages, salaries and earnings so assigned; and all assignments of wages, salaries and earnings, not earned at the time the assignment is made, shall be null and void.'' WALKER, J., at page 714, in sustaining

.the validity of above act, said: "The exercise of the police power as evidenced by various phases of legislation affecting individual liberty or personal rights, has met with judicial approval in many cases, the rule to be deduced therefrom being that in civilized society there is no such thing as an unrestrained power on the part of the individual to contract, this right being subject to wise and beneficial police regulations; and when an act which may prove detrimental to the public welfare is prohibited by a general statute, it will be upheld unless it is clearly in violation of some provisions of the organic law. [Grimes v. Eddy, 126 Mo. 168, 26 L. R. A. 638; State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1, 45 L. R. A. 363; Karnes v. A. M. F. Ins. Co., 144 Mo. 413; Morrison v. Morey, 146 Mo. 543.]"

We have quoted at length from the above authorities on account of the second constitutional question presented in this case, the validity of which must be determined largely by the principles enunciated in foregoing cases. Tested by the law as declared in the above authorities, the act under consideration is not obnoxious to the criticism leveled against it by appellant, and is accordingly sustained.

II. Appellant's second assignment of error alleges that: "The court erred in sustaining the plaintiff's challenge to the juror, Marlin, otherwise qualified, solely on the ground that Section 6655, Revised Statutes 1919, Juror. authorizes the challenge of a juror if the juror's employer is or within six months has been the client of the attorney representing appellant, because said section is violative of Section 53 of Article IV of the Constitution of Missouri. Dunne v. Ry. Co., 131 Mo. l. c. 5; Woolley v. Mears, 226 Mo. l. c. 50; State ex rel. v. Messerly, 198 Mo. l. c. 356; State ex rel. v. Miller, 100 Mo. l. c. 449; Sellers v. Hayes, 72 N. E. (Ind.) 119."

Section 6639, Revised Statutes 1919, reads: "In every county of this State now containing or which may contain hereafter, according to the last preceding national census, not less than sixty thousand inhabitants nor more

than two hundred thousand inhabitants, petit jurors for the circuit court and for the court having jurisdiction of felony cases shall be selected as hereinafter provided."

Under the uniform rulings of this court, the above section, which stands unchallenged, should be construed as a general and not a special law, as it applies to every county in the State, which *now* has, or may *hereafter* have, the requisite population. [State ex rel. v. Miller, 100 Mo. 439; State ex rel. v. Bell, 119 Mo. 70; Dunne v. K. C. Cable Ry. Co., 131 Mo. l. c. 5; Haizlip v. Haizlip, 240 Mo. l. c. 396 and cases cited.]

Section 6648 names persons exempt from jury service. Section 6649, Revised Statutes 1919, unchallenged by appellant, reads as follows: "Any person may challenge any juror for cause, for any reason mentioned in the last section, and also, for any causes authorized by the laws of the State."

Section 6655, Revised Statutes 1919, which is challenged as special legislation, reads as follows: "If upon the *voir dire* it appears that any juror is in the employ of any person, firm, or corporation who has within the six months last passed employed, or who within such time has had in his or its employ, any attorney on either side of the case being tried, the opposing party shall have the right to challenge such juror for cause."

It will be *presumed,* in the absence of evidence to the contrary, that the legislators, in the exercise of their prerogatives, as members of the coordinate branch of the State Government, became satisfied, before passing the above section, that conditions existed within the counties called for in Article 2, Chapter 53, Revised Statutes 1919, which made it necessary, in the orderly administration of justice, to provide juries for the trial of cases who were entirely disinterested, and free from the influence of attorneys on either side of the case. In view of the extent to which this court has gone, as shown in the authorities heretofore cited, we are unwilling to declare, as a matter of law, that the legislators of the State, in the exercise of their police power, acted unwisely in pro-

moting the ends of justice by providing impartial jurors to try cases pending in court.

(a)    Aside from the foregoing, even if the above section were declared illegal, we would not reverse and remand the cause for a new trial on this account, because there is nothing in the record to indicate that defendant did not receive a fair and impartial trial, before a competent and unprejudiced jury. In other words, we are asked to declare Section 6655, supra, unconstitutional, because defendant was denied the opportunity of having a client of his attorney retained on the jury, and that too without attempting to show that the twelve jurors which tried the case were not qualified in every respect to fairly try the cause. Section 1276, Revised Statutes 1919, provides that: "The court shall, in every stage of the action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

Section 1513, Revised Statutes 1919, reads as follows: "The Supreme Court, or courts of appeals, shall not reverse the judgment of any court, unless it shall believe that error was committed by such court against the appellant or plaintiff in error, and materially affecting the merits of the action."

We accordingly hold that the constitutional question is without merit as applied to the facts of this case, for the reasons heretofore assigned.

(b)    Turning to the abstract of record, we find that plaintiff's counsel objected to the competency of H. F. Riepen to try the case, on the ground that he was a client of defendant's counsel. Thereupon the latter interposed the invalidity of said Section 6655, Revised Statutes 1919, as class or special legislation. Counsel for respondent disclaimed that he was relying on said section, but placed his objection on the inherent right of the court to excuse said juror. The court excused Mr. Riepen under the foregoing cir-

*Fair Trial.*

*Inherent Right of Court.*

cumstances, and no exception was saved by defendant to said ruling. Juror Allen Marlin testified that he was employed by the News-Press, and it was admitted in open court that defendant's counsel represented the News-Press. Counsel for plaintiff objected to the competency of said juror, but not by reason of Section 6655, supra. Thereupon the trial judge arbitrarily injected into the case said Section 6655, Revised Statutes 1919, by declaring that he would enforce said statute, when he could have excused Marlin for the same reason he excused Riepen. The trial judge had the power to excuse Marlin under the circumstances aforesaid, without regard to Section 6655 supra. In State v. Taylor, 134 Mo. l. c. 141, we said: "And it is not to be forgotten that a court may, of its own motion, examine veniremen and excuse them, although not challenged by either party. [2 Elliott's Gen. Prac., sec. 531, and cases cited.] And it is held that a court has a wide discretion in such matters, the exercise of which is not available error unless abuse of such discretion be shown."

Aside from what has been previously said, our attention has not been called to any opinion of this court in which the cause was reversed because a juror was excused, on account of his being a client of one of the attorneys in the case.

Considered from any viewpoint, we are of the opinion that the foregoing assignment of error is devoid of the slightest merit, and is overruled.

III. The trial court is charged with error "in overruling the demurrer to the evidence, because there is no **Demurrer to Evidence.** substantial evidence to sustain the charge of negligence in the petition."

We have made an exceedingly full statement of the facts on this branch of the case, taken directly from the testimony of the witnesses as shown by the abstract of the record. Section 7585, Revised Statutes 1919, provides that: "Every person operating a motor vehicle on the public highway of this State shall drive the same

in a careful and prudent manner, and at a rate of speed so as not to endanger the property of another or the life or limb of any person.''

Without repeating it again, we find that there was substantial evidence offered by respondents tending to prove this branch of the case. It was the peculiar province of the jury to pass upon the weight of the evidence, and the credibility of the witnesses. We think that the jury were justified in finding from the evidence that the driver of defendant's automobile, in broad daylight, drove his machine at a fast rate of speed, down a heavy grade, over a hard pavement, made slick by rain or oil, without attempting to stop, and while in plain view of this five-year-old helpless little girl, who was on the crossing, throwing up her arms in distress, ran against and injured her by negligently losing control of his car.

In view of the foregoing, and other facts, connected with the case the trial court committed no error in overruling defendant's demurrer to the evidence at the conclusion of the case, and in submitting the same to the jury.

IV. Instruction numbered one, given in behalf of plaintiffs, is based on the evidence in the case, and within the charges of negligence specified in petition. The court committed no error in the giving of same.

V. Instruction numbered 2, given in behalf of plaintiffs, is based on both the petition and facts of the case. It states correct principles of law and was properly given.

VI. Instruction numbered 7, complained of by appellant, relating to the measure of damages, reads as follows:

"The court instructs the jury if you find for the plaintiffs you will assess their damages, if any, at such sum as you may believe from the evidence will reasonably compensate them for the death of their daughter, in such an amount as you deem fair and just, under the circumstances in this case, with reference to the necessary pecuniary injury to them re-

*Measure of Damages.*

sulting therefrom, if any, as shown by the evidence, not exceeding ten thousand dollars, and having regard to any mitigating and aggravating circumstances, if any, attending the acts producing the injury complained of. You are further instructed that in arriving at the pecuniary loss to the plaintiffs, if any, you will take into consideration the money paid or agreed to be paid by the plaintiffs for medicines, medical and surgical attention, hospital bills, nurses, ambulances, and any reasonable and necessary expense incurred in caring for her during the sickness caused by said injury, and also funeral expenses, to which should be added the value' of whatever service and assistance she would reasonably have been expected to have given to plaintiffs until she became of legal age, that is, until she was twenty-one years old.''

The defendant asked, and the court gave at his instance, instruction numbered 4, relating to the measure of damages, as follows:

''The court instructs the jury that plaintiffs cannot recover for and you must not consider any damages which the plaintiffs' child, Betty Hicks, may have sustained or any pain or suffering she may have endured in consequence of any injuries she may have received, nor any mental suffering or grief or bereavement of the plaintiffs, nor any loss of the comfort or society or love of the plaintiff's child.''

Instruction 7 does not authorize a verdict within itself. It is good as far as it goes, and the court gave defendant's modification of same as requested in Instruction 4, supra. If counsel for defendant had reason to believe that plaintiffs' instruction on the measure of damages was misleading or might warrant the jury in assessing damages to which plaintiffs were not entitled, they should have pointed out to the trial court their objection thereto, and have covered the point in their own instruction on the subject. On the record presented here, the trial court cannot be convicted of error in giving plaintiffs' Instruction 7. [Browning v. Ry. Co., 124 Mo.

l. c. 71-2; Minter v. Bradstreet Co., 174 Mo. 491; Smith v. Fordyce, 190 Mo. l. c. 30-1; Waddell v. Railroad, 213 Mo. l. c. 20; King v. St. Louis, 250 Mo. l. c. 514; Powell v. Railroad, 255 Mo. l. c. 454; Breen v. U. Rys. Co., 204 S. W. (Mo.) l. c. 523; Morton v. Lloyd Const. Co., 280 Mo. l. c. 382, 217 S. W. 836; Berryman v. So. Surety Co., 285 Mo. l. c. 396; Hoover v. Ry. Co., 227 S. W. l. c. 79 and cases cited; Jones v. Frisco Ry. Co., 287 Mo. l. c. 81-2, 228 S. W. 785-6; Brickey v. Ry. Co., 259 S. W. (Mo.) l. c. 480; Rigley v. Pryor, 290 Mo. l. c. 26, 233 S. W. 832.] It is evident that the jury were not misled by the instructions relating to the measure of damages, for the verdict, taking into consideration the large amount of actual expenses paid by plaintiffs, was a very modest sum. The above assignment is accordingly overruled.

VII.   The court committed no error in refusing defendant's Instructions D and E, as asked. We have covered this subject in the previous discussion of the case.

VIII.   Without prolonging this opinion, we find that the defendant received a fair and impartial trial before an unprejudiced and disinterested jury; that the plaintiffs made out a meritorious case, and that a reasonable verdict has been returned in their favor. We further find that no prejudicial error was committed during the progress of the trial of which appellant can legally complain. The judgment below is accordingly affirmed. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, J.,* absent.